Welcome back, long time no see. I understand you were with Mr. Goldberger yesterday. Mr. Goldberger, how would you like to proceed, sir? Well, I'd like to give my argument and keep to the 15 minutes. Well, I'll reserve two for rebuttal. Thank you. Whenever you're ready, counsel. Thank you. May it please the court. My name is to represent Terrence Young, who is the appellant in each of these consolidated appeals. One is from the denial of a motion to dismiss and the other from an amended judgment imposing restitution in the criminal case. The freedom of speech, as the Supreme Court has reminded us, requires breathing room to thrive. And for this reason, the First Amendment doctrines embrace an overbreath principle, which allows a kind of third party standing. Was this speech or conduct? Your client's activities here, was it speech or conduct? Well, the motion doesn't address my client's conduct. It's a third party standing rule. But I think it's fair to say that there was some speech. Well, speech is a kind of conduct. But there was speech. There was some protected speech. There was unprotected speech. And there was pure conduct, which is not speech at all in those many pages listing the many activities. But the point of a motion to dismiss on overbreadth grounds is to identify a statute, which on its face as worded and as those words have been construed, reaches a substantial amount of protected speech relative to its legitimate scope. And the legitimate scope encompasses both unprotected speech and conduct, which is not speech at all. Applying that principle, Mr. Young's motion to dismiss the count under section 2261A to B should have been sustained. Mr. Goldberger, so let's talk about the aspects of this statute that the government points to as saving it. Is the difference with the earlier statute 2013 with electronic means, is that really significant here in changing this from earlier versions of the statute? I take it you're focusing on other parts of the statute, not specifically the more of an overbreadth problem here. The overbreadth problem was principally created in the 2006 amendment and was made worse in 2013. All right. So we're talking then about, in terms of mens rea, intent to intimidate and harass or harass. And then with the result element that be about the substantial emotional. Those are really the two foci of your argument. Those are the two that the government invokes to save the statute, and neither of which succeeds. Explain to me, what's your perspective on the First Circuit's cases here? Sayer and then Akel say that these are fine. They've got some footing here. The government points to Virginia v. Black, which reads intent to intimidate as constitutional because intimidation in the sense of a fear of death or serious bodily injury, you have no beef that you can criminalize putting someone in fear of death or bodily injury. You just question whether intimidate ought to be read that way. That goes to the limiting construction. Okay. That goes to the limiting construction. But Sayer and Akel thought that was fine. Rodriguez was interpreting the post-2006 version of the statute. Had most of the same problems. Granted, it's just a footnote. There's not a lot there. Is your perspective that Sayer and Akel are wrong or that they're distinguishable? They are both. They are wrong in some respects and distinguishable in others. Akel involved a review of a jury instruction and the question of whether the jury instruction given at Akel's trial contained an adequate limiting construction to protect him in his own trial. It was wrong in demanding what the First Circuit, which loves fancy vocabulary, called veridical examples to prove the relationship between the improper and the proper applications of the statute where the Supreme Court has rejected that approach in Stevens. There's a little of each. I found your effort to deal with these. Could I comment on Virginia v. Black for a second? Virginia v. Black is a cross-burning case. The intimidation cases that went to the Supreme Court about cross-burning say that the burning of the cross has a history which makes its meaning special and specific so that its intimidating character is a true threat because of the nature of the conduct. Got it. But you can't distinguish Boose v. Berry that way. Boose, even though it struck down the law, said an alternative law that became the current one about intimidating diplomats or whatever would be fine. So you can't limit the principle to cross-burning cases. The intimidation, the limiting instruction that would survive has to be a limiting instruction. To make intimidation effectively a category of unprotected conduct or speech, it has to be essentially a true threat. And what happened in Mr. Young's case is that he challenged on a pretrial motion Judge Stark wrote an opinion and did not adopt any limiting instruction. What I find odd, though, is that your client pleaded guilty and yet all he reserved was the right to appeal over breadth. He didn't reserve the right, he didn't get to a jury instruction point. He didn't ask for a jury instruction to interpret, intimidate in this light. I found your discussion on page 27 of your brief very puzzling. You have a footnote. If we were to adopt this limiting instruction, we couldn't affirm we'd have to vacate and remand and give him a chance to withdraw his plea, but your client this is not really an over breadth problem. This is a problem of what the jury instructions should have read if he eventually got to trial, which he didn't. So then I don't understand why we can't just adopt a limiting instruction, limiting construction and affirm. If we disagree with the First Circuit, that's one thing. But if we agree with the First Circuit, I don't know why we can't do that. It seemed to me in puzzling out this question about how the doctrine applies in a guilty plea setting, it seemed to me that the defendant would never have a knowing and intelligent plea unless he knew the meaning and scope of the statute under which he was pleading guilty. So the limiting instruction would have to be given in the decision denying his motion. This is interesting. Otherwise his plea comes to... Wait, wait, wait. What we require at plea allocutions is reciting the elements, but not going through and explaining them. Iowa v. Tovar, you have to understand only in general terms what you're being charged with. The usual rule is in Brady v. United States that as long as you've got competent defense counsel, we count on defense counsel to explicate the rest of it. So maybe if the defense lawyer misrepresented it, if something else, maybe that's an issue to raise on habeas at 2255, but we don't normally expect that level of detail to make a plea knowing and voluntary, at least from the judges affirmatively spelling this out at the plea hearing, beyond just reciting the statutory elements. You can't sustain... You can't sustain a plea knowing and voluntarily construing the statute after the fact to eliminate the problem. That's like... It's the judicial equivalent of an ex post facto violation. You're suggesting there ought to be a special rule in overbreadth cases because in overbreadth cases, a narrowing construction is essential to the constitutionality here. It's an interesting idea. Do you have any support for it? I did not find any. I did not see that the question had been asked about the exact problem that you were exploring there. It seems to be the equivalent of the interpreting an otherwise... The vagueness cases are very clear on that, that you can't remediate the vagueness after the fact with an appellate decision. Did you find anything that talked about vagueness in a plea elocution context? I mean, I'm not aware of anything either way. I think the cases that I've seen on appeal are all appeals from trials, but it would be the same point. It's not as hard a point with vagueness as it is with overbreadth. Okay. You talked about the intent element. The intent elements which create the problem are intimidation and harassment. This court has stated in Judge Alito's opinion many years ago that harassment... pointed out that harassment is not an exception to First Amendment doctrine. The First Circuit tried to get around that by saying harassment means something much narrower in this context, but they just said so. I mean, there's no basis in the statute for that. It isn't the word that I'm trying to remember what the expression they used exactly was. They identified harassment with a category of unprotected speech that doesn't have the same meaning at all. Mr. Gold, let me talk about restitution for a minute. All right. Let me just start with this. Do you agree that Georgetown is a victim? Georgetown is a victim within the meaning of 3663, but not within the meaning of 2264, which is the specific provision for stalking cases, which is why Judge Stark reverted to 3663 and we don't dispute that. So, under that statute, you got... your argument seems to be one based on lack of damage and one based on lack of property. What do you say to the government's argument that intangibles can be counted as property? Their functioning business, goodwill? If there had been... the problem is there was no damage to be repaired. So, and no property taken to be replaced. Those are the categories of property damage. The problem is not tangible versus intangible property, but the lack of repair or replacement, which are the categories that are covered. When a victim chooses to enhance their security or other arrangements to prevent a future crime, they're not... that is not recompensed as restitution. Okay. I'm kind of surprised you can see that point because I'm not sure it's property in the first place, but... There is intangible property. I'm not sure there... There is, but they're not talking about a problem to like a trademark or something. Oh, maybe I misunderstood the question. I thought you were asking whether I conceded there was such a category. No, I think what Georgetown tried to claim here is not property damage at all. That's right. Let's talk about the waiver here, the appellate waiver. So, your client, you negotiated the plea deal, wasn't you? Trial counsel, I presume. Federal defenders, yes. Federal defenders. And there was individual dickering of the scope of the plea deal and it carved out this right to appeal the First Amendment overbreadth issue and it preserved statutory maximum, sentences above the maximum, but it's a little awkward at least to call this above a statutory maximum where restitution does not have a maximum. There is a maximum. But in Leahy, we, for Sixth Amendment purposes granted, we didn't treat that as subject to appending. Before... Well, and it was before Southern Union. It's before Southern Union. You've preserved your right on that. I understand that. Yeah. Okay. Well... I don't... Restitution has a maximum, which is expressed as a category, not as a number. But it's still a maximum. That is to say, you cannot impose... I mean, the government's argument would suggest that the judge could impose any restitution of any sort in any amount for any reason, including, for example, the Georgetown example that we just gave, without judicial review. No reasonable defendant would understand the plea agreement that way. The restitution was mentioned in the plea colloquy in the same context where the word statutory maximum was used twice, once by the prosecutor, once by the judge. This is exactly a statutory maximum. The amount of loss, as loss is defined in the statute, in the applicable statute, is the maximum. That... I don't know what else a defendant in pleading guilty, and that's how we construe plea agreements, could think the maximum was, or what those words could mean. Let's say we disagree with you on that. Talk to us about katak and the miscarriage of justice. Exactly. So in any event, it would certainly be a paradigm miscarriage of justice to allow the imposition of an illegal sentence exempt and make it exempt from judicial review. It becomes an illegal sentence, a sentence that Congress has not authorized, which is what we mean by an illegal sentence. That is the most fundamental of miscarriages of justice in the criminal law context, would be conviction for conduct which Congress has not made a crime or imposition of a penalty that Congress has not specified for the crime. What's the closest precedent you have here? A case... I seem to recall a case in which someone pleaded guilty to something that wasn't a crime. I had such a case. That's one of the cases I cited. I'm just blanking the name right now, but I listed a number of such cases. There is... On the principle that no court can allow a sentence that the law doesn't authorize, there are many such cases, Welch and the juvenile life sentence cases and so forth all stand for that proposition. Castro was the third circuit case where the defendant pleaded on a set of facts that didn't make out the crime. This court held on plain error and exemption from the plea agreement to vacate that count. With respect to victim number one, who is under the 2264 statute, the specific statute for stalking cases, our challenges to the attorney's fees and investigative costs... The statute allows attorney's fees. The statute that applies to that to victim one. It allows attorney's fees in protection from abuse cases and not in any other category. Wait a second. Tell me why you think that's the right reading of B3E. Just because it happens to mention any cost incurred in obtaining a civil protection order. There's a comma. Attorney's fees isn't an adjective that modifies civil protection order. They're two separate parts of the phrase. I have pages on this subject in my brief. The comma... I believe there is a missing comma that shows... That would be after in to make that a phrase, but the comma's not there. The case of the missing comma. Well, there are any number of reasons. There's no other subcategory that covers two unrelated things. If these two things are meant to be two different categories, costs in protection from abuse cases and attorney's fees of any kind, they wouldn't be in the same lettered subsection. No other subsection reads that way. I cited the Supreme Court case that says where all the other indicators of statutory construction point in a certain way that the Supreme Court can't do that. I think it's that kind of case. I thought that the rule from cases like Green v. Bok-Longry was we can correct a scrivener's error where there's no way you could read Bok-Longry as saying that the defendant can't... Not the criminal defendant's testimony. This one, you say it's more like to the fiction 10. The C-59 which has the same list of categories, the difference between the two is very telling, and the Government's argument is principally actually... The Government's argument is to disregard this subsection entirely and to rely on the catch-all at the end, and just say that any loss, which is proximately caused by the C-59... That's how Paroline treated it that broadly. You can't read it so as to negate... Paroline did not read that clause so as to negate a limitation in a category imposed by the words of the subsection that talks about that category. The example I gave in the brief is under the Government's construction, the section on necessary transportation and housing would be... The necessary would be disregarded, and any unnecessary expenses would be subject to mandatory restitution. It's just... It makes nonsense of the whole statute. It's not beautifully written, but you still have to do your best to make sense of it. And under that construction, you make no sense. So those parts of the restitution should be stricken, and if we don't dismiss the count. But I think that the strong argument on dismissal shows us that when we compare the... Let me just wrap up on the overbreadth question. The fundamental doctrine in overbreadth is to compare the scope of the overbreadth with the plainly legitimate scope. I gave plenty of completely realistic examples from today's unpleasant Internet world where this statute would criminalize ordinary activity seen every day in thousands and tens of thousands of instances, no doubt, of comments on Facebook and newspaper websites and all kinds of things that would be criminal under the government's overbroad construction of the statute relative to the conduct that Congress certainly could with a properly written statute prohibit if it chose to do other than it did in 2006 and 2013 and expand the statute endlessly beyond its proper limits. Thank you. We ask for a reversal of the denial of dismissal. Judge Roth, do you have any questions? No, I do. Ms. Mandelbaum. Good morning and may it please the court. Ruth Mandelbaum on behalf of the United States. Thank you for the opportunity to appear in front of you today to argue this case. This case involves two separate issues and this court should affirm the district court's opinion on both of them. First, this court should find that the stalking statute is not unconstitutionally overbroad. In doing so, it will reaffirm its decision in Gonzales and join every single one of its sister circuits to have addressed this question. Ms. Mandelbaum, let's assume that we follow the First Circuit. There is this very interesting issue of what Mr. Young knew at the time of his plea agreement and I think it's an interesting point. Was his plea agreement not knowing and voluntary if the judge didn't lay out for him what the government would have to prove here? I think that's certainly a stretch. It stretches beyond what case law has required in a plea agreement and a plea colloquy to make a plea knowing and voluntary. The issue of a limiting construction and whether the defendant was on notice goes to whether the defendant could have known at the time that his conduct was criminalized and that's laid out in the Supreme Court case Osborne v. Ohio. In that case, the Supreme Court held that if a statute is construed  as a limited construction, then the defendant was fairly warned. A limiting construction narrows the statute as applied to this particular defendant. It does not expand the statute into a realm that he could not have been put on notice that the conduct he individually engaged in was subject to the statute and it's also interesting in the fact that there is no as applied challenge here. Mr. Goldberger did not bring one. The defendant did not carve one out either at the district court level or at this level. This is an over breadth challenge. It challenges the constitutionality of the statute generally, but the defendant was clearly on notice that the conduct that he engaged in fell within the statute whether or not a limiting instruction was employed. More generally, the statute is not over broad because it is directed at unprotected conduct most often in the private sphere rather than protected speech. This helps the court in determining the over breadth analysis because the court is really charged with balancing whether the amount of unprotected speech that falls within the statute is substantial relative in an absolute sense and relative to the broad scope of legitimately criminal conduct that is encompassed in the statute. Let's talk about this. Mr. Goldberger makes a fair point. Dialogue on the internet is better called diatribe often. There's a lot of trolls, a lot of people being mean and cruel and trying to upset people to cause substantial emotional distress. The breadth of people claiming that they were harassed is huge, often based on one or a few minor and pervasive pattern of conduct. None of this appears to apply to what Mr. Young actually did, but he does have a point that there's a substantial amount of people out there who could claim that someone was trying to intimidate or harass them and emotionally abuse them. Yes, and if they were able to show that those high bar elements of intent and result were met in the specific case, then it would fall within the ambit of the statute. It is unlikely, however, that that speech would be considered protected by the First Amendment. Wait a second. He's got a point about sex. These days, if someone quote misgenders someone else, he might be accused of trying to inflict substantial emotional distress. If there are disagreements about hot button social issues, lots of different ones. People would say you were trying to humiliate, annoy, intimidate me. People will claim very substantial emotional harm, and they'll feel it subjectively, and there's no objective requirement built into the statute. Aren't those kinds of things protected? I mean, sex was a case in which Justice Alito said someone who had unfashionable views on LGBT issues could raise a claim, and that that was in fact speech protected by the First Amendment, but they had a reasonable fear that they'd otherwise be sanctioned at school. So the Sachs case is actually very important in showing why the stalking statute, the two elements in the stalking statute work together to narrow its scope. The Sachs case had no intent requirement. I could unintentionally misgender someone, and that person could suffer severe emotional distress, but unless I am doing that with the intent to intimidate, with the intent to harass, not with the intent to annoy, as you mentioned, or the intent to humiliate, then it doesn't fall within the ambit of the statute. I take Mr. Goldberger's point to be that intimidate and harass are broad, somewhat elastic words. The dictionary, the root of intimidate, to make someone timid or in fear. Well, people can be in fear of being called out by a pronoun they don't like or something. So there are people who will say something like that, and yet Sachs says that's not enough. I think intimidate has this narrower meaning in Virginia versus Black, but Mr. Goldberger connects that up to the violence connected with cross-burning. So how do we know that the, how are, why should we read a criminal statute here in the constitutional way and not in this kind of broad colloquial understanding of intimidate or harass? So two points there. First that there's some conflation here between the intent element and the result element. Just because someone would feel intimidated doesn't mean that the actor was doing so with the intent to intimidate. So it's true, but sometimes we invite juries to say you can infer the intent from the logical consequences of the intent. So we have to worry a little about that, but I get your point. Yeah, and you can also infer the intent based on the Third Circuit model jury instructions based on the person's actions and what that person said, what that person did. In a situation where speech is at issue there are things the person said and did that the jury can also consider and determine their intent. But separate from that, why should we read this more narrowly? It should be read more narrowly if a limiting construction needs to be employed and can be employed, this government or this court is required to do so in order to save the statute. So to the extent that this court is concerned that the general meaning of the word intimidate or harass is too broad to save the statute then it could employ a limiting construction similar to what was done in the First Circuit. Let me ask you about that. The biggest problem with the limiting construction here seems to be that if we read it that way, isn't subsection 2A surplusage? Doesn't it get swallowed up? Is there anyone who's ever going to fall afoul of 2A who's not also going to fall afoul of 2B? I'm just reading the statute, Your Honor. One moment. This is 2261A to subsection 2. So subsection 2A and subsection 2B are talking about the result elements of this statute. I believe you were talking about the limiting construction that would apply to the intent element that is in general subsection 2, not in one of the further subsections. So I'm not certain why reading a limiting instruction into the intent element would then affect what is happening in the result element. I mean, I guess it's that you wouldn't need you know, harass or intimidate. Those are intents that seem to get at emotional distress. But if you've added yeah, okay, I see. Your argument is basically there's not really any, there's a disconnect between the intent and result elements here and narrowing the first doesn't toss out the second. Whatever surplusage problem there is, is a surplusage problem regardless. If you believe that everything in subsection B encompasses what is in subsection A then yes. But the issue the subsection at issue here is subsection 2B. And the government contends that both the intent and result elements are necessary to save the statute from overbreadth. Because for example, in the for not those intent elements and that element is very important in narrowing the scope of the statute. If there are more questions about the First Amendment, I'm happy to entertain them or I can move on to the restitution. Could you go to restitution and address the property issue that Judge Beamis discussed with Mr. Goldberger? Absolutely. So the property that Georgetown, that was damaged by Mr. Young's conduct was the safety and security of Georgetown's campus. We don't, safety and security we don't ordinarily treat as an intangible or IP right. You know, this is not a patent or a trademark. You know, in criminal cases we tend to read statutory phrases narrowly. It's a matter of lenity. Why should we read this phrase very broadly to encompass safety and security? So the court the Third Circuit in the Hands case read something similar that has not traditionally been held to be formal property, including intangible property. The right to a guilty jury verdict and held that that was property. I think is especially with regards to this statute what is affected is not necessarily tangible property. And the idea of property as kind of a physical bundle of sticks has expanded both in the IP sense and more generally over the past several decades. So if we kind of compare, and I recognize they're under different statutes here, but if we compare victim one and what was compensable to him he felt that his security, the security of his home was damaged by Mr. Young's conduct. I've got it but the Congress drafted a broader statute there and he's a direct victim and pretty much anything that's a direct and proximate result of the offense can be caught at least by the catch all provision there, at least if we accept the common reading of it. But that's not how Congress wrote the other one and in a criminal case we'll ordinarily read it. We're not going to stretch for some kind of cutting edge property theories. I wouldn't call this a cutting edge property theory but I also think that this conversation demonstrates why any alleged error does not rise to the level of a miscarriage of justice. Before we get there, I do want to get there, but let's even assume we treat this as property why we should treat this as damage to property? I mean the verbs are about what you need to repair or restore property and that again on the date of the damage what is it? The damage, loss, or destruction. Loss or destruction of property. That again kind of leans us towards either a tangible or at most an IP intangible notion of it. How are we repairing or restoring? What damage, loss, or destruction is there here? The killing court addressed what to do in this situation where there was property that had been harmed but it couldn't be exactly replaced or repaired and in that case the court said that because the property damage was not taken, you couldn't return it same case, same instance here, and that the district court's only practical option was to order the defendant to pay the costs of ensuring that that property was in the same condition as just prior to the time it became unusable. Right, but here isn't the only support for Georgetown's restitution the letter from the security expert at Georgetown and it was improvements to the security systems going forward, right? Georgetown requested restitution both for repairing the security of the campus during the time Mr. Young was engaging in his conduct. It was really improving the security because his son was there, right? There's nothing broken, they just needed to make it better. It was not adequate to handle the threat that Mr. Young posed What they already had had not been harmed. It had not been harmed so this is another place where the Killen case I think makes a lot of sense to look at. In that case, white powder was sent to the state parole board it was totally harmless white powder, baking soda, something the state parole board, there was no actual physical harm that resulted from that powder being sent there. There were real cleanup costs and there were real cleanup costs, repair costs here. Because of the way Mr. Young was engaging in his conduct, because he was sending third parties to physical locations where victims were located, to victim one's home, there was a danger that the same thing could happen on Georgetown's campus and as a result, the campus did not have the same level of safety and security that it had prior to Mr. Young beginning to engage in this conduct. And as a result, they were entitled to restore the campus to that same level of safety and security. If my colleagues want to stay on this issue, I'm happy to, but I do want to make sure we have some time to hear about the appeal waiver here. I want to hear your thoughts on statutory maximum, but I also want to hear on Katak and the miscarriage of justice exception. Sure, so I will move on if there are no other questions from Judge Estepo or Judge Roth on Georgetown. Please do, from my perspective. So, regarding the statutory maximum, I think there are four different reasons why statutory maximum should not be read to include a restitution award. The first one is what was laid out in the government's brief and Judge Bibas spoke about when discussing this with Mr. Goldberger, the Leahy opinion and how the term statutory maximum is used by courts, including this court. The second reason is the way Congress has determined what a statutory maximum is. In substantive statutes, Congress has placed a solid statutory maximum number for both the number of years one can be incarcerated and a fine that someone can pay. Congress recognized, and this court has recognized, that restitution is determined more on a case-by-case basis. Congress could have put a hard limit on restitution, could have said, under the Violence Against Women Act, restitution is limited to $10,000 or $100,000 or $1 million, but it didn't. That's because it's based on a case-by-case basis. Third, the way statutory maximum is used generally when we speak. It refers almost always to the statutory maximum of an incarceration term, sometimes now based on recent Supreme Court precedent, a fine, but it is always tied to that limited number. Finally, the plea agreement itself discusses the statutory maximum in the context of an incarcerative sentence. It has a specific carve-out for the broad appellate waiver. There's also a paragraph 8 of the Joint Appendix which is on page 121, where it discusses generally the incarcerative sentence. It talks about specifically a statutory maximum the court will take into consideration and the sentencing guidelines and the sentencing factors. Then Mr. Young states that he's aware that he cannot withdraw his guilty plea based on a sentence other than the specific carve-out for statutory maximum. This looks to me like it might be a U.S. Attorney's Office kind of template of a plea agreement. Is it, to your knowledge, is it based on especially the appeal waiver paragraph? The appeal waiver paragraph is with the exception of the specific carve-out. Your office drafted this and then the counsel individually dickered that particular carve-out, right? Right, and could have at the time knowing that restitution was not set yet have negotiated a carve-out for a restitution award and did here negotiate some agreements based on what the base offense level would be under paragraph five, which affects the incarcerative sentence, but there was not a specific discussion about restitution. Okay, but the reason I ask that is that in contract law, which gets drawn on in plea agreements, we normally construe a contract against the party that drafted it and your office drafted this so shouldn't we lean in the direction of preserving his appeal rights? I think all else being equal, perhaps, but this is not ambiguous for those four reasons that I just pointed out. It is clear that statutory maximum does not include a statutory maximum for the restitution award and that's further Let's assume we agree with you on that. Let's talk about the exception. It's true, you know, our cases have declined to spell this out in detail. Katuk itself says we're not going to give a comprehensive definition. Here are some factors to look at, but one of the things we did, I think we cited a Fourth Circuit case that talked about a sentence that was beyond that authorized by law. So statutory maximum may be the shorthand we're using these days, but more generally it's talking about when the defendant has a right to appeal. And I think Mr. Goldberger makes a strong point. The defendant generally can waive most of his rights, but there are some rights that serve a broader goal. There's a reason why generally we don't enforce an appeal waiver or certain claims of race discrimination. And it's the reason why statutory maximum is carved out. If there's a separation of waiver of that as unenforceable against public policy, but different from the ordinary bargaining chip rights that a defendant has the authority to bargain away. Appellate waivers, this court has approved of appellate waivers that carve out broad rights, that carve out constitutional rights, that carve out these rights to appeal. And I just briefly mentioned that any appeal is a contention that something was done illegally. But most of the rights we're talking about are defended protective rights. You can bargain away your Fourth Amendment rights, you can waive your Fifth Amendment rights, but if it comes to waiving your right to a judge with Article III protections, I'm not sure we would say that you can agree you're going to be prosecuted and convicted by someone who's not gone through that process. So we wouldn't allow someone to be there are some structural protections like that, like conflict-free counsel, that we don't treat as waivable. So why shouldn't we look at this separation of powers concern for whether Congress even made something a crime? Are you saying that you could waive a challenge to whether something was even covered by a criminal statute in the Castro case that Mr. Goldberger raised? I think that would amount to a miscarriage of justice. Okay. And so, what gets you to the miscarriage of justice is I think where you're going. If you're going somewhere else, please redirect me. But the first two factors here are the clarity and the gravity of the error. If someone is accused of a crime that doesn't exist under the statute, that's a pretty clear error. The place we're here now is a discussion that we just had about Georgetown, about what is the meaning of a property right? Can it be expanded? Should the Killen decision control? Should the Davis decision control? With regards to victim one, you were talking about the placement of a comma, whether there should be an additional comma. In his brief, Mr. Goldberger talked about whether we should read an unwritten direct requirement into another restitution statute. This is not a clear error. This is an error that is if it exists, is certainly debatable. We've spent the last half hour debating it. In terms of the gravity of the error, it is not to the same import than if a judge convicts someone of a crime that does not exist and could continue convicting individuals of that crime going forward in the future. Some of the other factors here are the impact on a defendant. The impact on the defendant of being convicted of a crime that is not in the statute is huge. That defendant has now a potential felony conviction. The entire sentence affects his entire life. Here the question is of scale. How much, Mr. Young, should pay his restitution? I'm not saying that the $200,000 here that are challenged is a minimal amount, but it's certainly not of the scale of being convicted of a crime that someone was not able to be charged with. Impact on the government is large in this case. Because it is so unclear, because we are having this debate, if the courts were to weigh in on every issue like this that were to come up, it would essentially negate the purpose of an appellate waiver. This court has held that appellate waivers are important for the government, for the defendant, and for the judicial system. The final factor is acquiescence of the defendant. I think the record is clear here that the defendant did not acquiesce to the restitution order, so that one at least goes in the defendant's favor. Based on those factors here, this does not rise to a miscarriage of justice. Holding so would open that very high bar to far more challenges in the future, where convicting a defendant of a crime that was not a statutory crime would almost certainly rise to a miscarriage of justice in every situation. Judge Roth, do you have any other questions for the government? No, I do. Judge Beavis? Mr. Goldberg? You're muted, Mr. Goldberg. Thank you. It would have taken me a little longer to figure that out. Yeah, I didn't realize we could mute Mr. Goldberg. Ah, lucky me. On that last point, I just want to say from many years of experience working with people who have had criminal convictions that I would not minimize the impact of a priority lien in favor of the United States for an amount of almost $200,000 that lasts for 20 years on a defendant's life relative to having a felony conviction. The impact is enormous. And so if it's illegal and a miscarriage of justice, it ought to be vacated and not trivialized. The statutory maximum point and this is my second point about restitution, and then one quick point on the overbreadth that the government makes about it being a hard maximum has to be a hard maximum is inconsistent with Southern Union law, which states that the maximum that a defendant can pay for a felony conviction fines have no hard maximum either. Contrary to what you just heard, the stated amount of the fine in the statute is the presumptive maximum unless the harm to the victim is greater, the defendant can be ordered to pay two times the amount of victim loss as a presumptive maximum, which is not a hard maximum. So that doesn't explain Southern Union. In any event, just on the result clause of the statute, I appreciate Judge Bibas bringing up subsection A as contrasted with B because what that shows us, this is about the result, what it shows us, A deals with a victim being caused to have fear of death or serious bodily injury. What this shows us is that when Congress expanded the result clause in 2013 to encompass substantial emotional distress, it meant necessarily emotional distress that falls short of harm of fear of serious bodily injury. And that's the distress, that's why the distress result factor does not remedy the overbreadth. It falls far short of exceeding First Amendment boundaries. There are terrible impact on the person who hears the speech, cases that are protected by the First Amendment, Snyder v. Phelps being the most obvious. So what we have here in this modern world of Internet abuse is a statute which on its face covers a very substantial amount of protected speech relative to a core, but not a very large core, of properly criminalized conduct of true threats, threats of death, and so forth. Those are there, they're real, and if the stalking statute were reverted to its pre-2006 form, it might be constitutional. But as expanded to cover all forms of interactive communication and the causing of fear of emotional distress, it has fallen across that line and becomes unconstitutionally overbroad. So for these reasons, both judgments should be reversed. Thank you, counsel. Thanks for your excellent arguments and your briefs. We will take this case under advisement. Patrick, are you still with us? Yes, I am. Patrick, we're going to ask the transcript be made, as it were, from this argument, and we'll ask the government to absorb the cost of that. And if counsel could just coordinate with Patrick as to the logistics of the transcript, great. Of course. We're adjourned. Thank you very much, everybody.